IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

CIVIL ACTION NO.: 1:17-cv-00713

NICOLE CHRIST                                                             PLAINTIFF

VS.                           MEMORANDUM OPINION AND ORDER

UNIVERSITY OF FINDLAY ET. AL.                                      DEFENDANTS

I.      INTRODUCTION

This disability discrimination action is brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et. seq.*, and the Ohio Civil Rights Act, Ohio Rev. Code. Ann. § 4112 *et. seq.* Nicole Christ ("Plaintiff"), a disabled former graduate student at the University of Findlay ("Findlay"), alleges she was discriminated against by Findlay and Ultimate Rehab, Ltd. ("Ultimate") for failing to implement an accommodation plan that contributed to Plaintiff's dismissal from her graduate studies in occupational therapy as a result of her work at Ultimate.

The matter is before the Court on Ultimate Rehab's Consolidated Motion to Dismiss. (Doc. 15.) Having reviewed the matter, and being sufficiently advised, the Court now issues this Memorandum Opinion and Order.

## II. FACTUAL & PROCEDURAL BACKGROUND

Plaintiff is a disabled female who previously enrolled in Findlay's Occupational Therapy Weekend Program ("Program") from June 13, 2013 through February 1, 2017.[1] (Doc. 11, PageID# 47.) Plaintiff's objective was to obtain a Master of Arts degree in Occupational Therapy at the institution. (*Id.*)

In October 2013, Plaintiff informed Findlay's disability office of her disabilities which include generalized/social anxiety disorder, attention deficit hyperactivity disorder, and auditory processing disorder. (*Id.* at 47-48.) In April 2015, Plaintiff disclosed her disabilities to Dr. Mary Beth Dillon, Chair of Occupational Therapy, and Heather Meredith ("Meredith"), Instructor of Occupational Therapy and Academic Fieldwork Coordinator, of her auditory processing disorder.[2] (*Id.* at 48.) At some point thereafter, Findlay granted Plaintiff an extra-time learning accommodation to complete assessments. (*Id.*)

In this environment, Plaintiff achieved academic success. She completed her Bachelor of Science degree between June 13, 2013 and December 2014. (*Id.*) Plaintiff then proceeded to undertake graduate-level work in occupational therapy. (*Id.*) By November 2015, Plaintiff completed the degree's classroom requirements successfully. (*Id.* at 48-49.) In addition to the degree's coursework, the Program required students to complete five field placements – three coded as "Level I" and two coded as "Level II". (*Id.* at 48.) Findlay's internal policies mandate that a student complete all field placements within two years of their classroom component. (*Id.* at 50.) Furthermore, any student who fails two Level II placements will be removed from the Program. (*Id.*)

---

[1] The University of Findlay is a private university located in Findlay, Ohio. (Doc. 11 at 46.)

[2] The Amended Complaint is unclear whether Plaintiff also revealed her other disabilities to either faculty member.

Plaintiff's accommodations were developed specifically to complete these placements and she finished all three Level I and one Level II placements. (*Id.* at 48-49.) Following the completion of her first Level II placement, Plaintiff began to encounter difficulty with her next two field assignments. (*Id.* at 49-50.) Both of these assignments required some prior clinical experience with hand therapy or clinical experience which Plaintiff lacked. (*Id.*) In each assignment, the field placement supervisor reported to Findlay that Plaintiff was misplaced due to her lack of experience. (*Id.*) In the latter placement, Plaintiff confided in Meredith that this assignment was aggravating her anxiety – manifesting itself in the form of hand tremors. (*Id.* at 5.) Meredith allegedly counseled Plaintiff not to discuss her anxiety with her fellow placement employees. (*Id.*) Plaintiff ultimately failed this placement. (*Id.*)

In December 2016, six months later, Findlay assigned Plaintiff to another Level II field placement with defendant Ultimate Rehab ("Ultimate")[3]. (*Id.*) Allegedly, Meredith provided Megan Weber ("Weber"), Plaintiff's assigned co-worker at Ultimate, with a copy of Findlay's learning accommodations.[4] (*Id.*) Plaintiff also disclosed her accommodations to Weber directly and Weber allegedly responded that Ultimate would have no problem integrating the accommodations into Plaintiff's experience. (*Id.* at 51.)

---

[3] Ultimate is a domestic limited liability company that provides rehabilitative services in Cincinnati, Ohio. (Doc. 11 at 46.)

[4] Plaintiff's accommodations were as follows:

>   1) Allowance for early arrival and delayed daily departure to complete patient documentation
>   2) Provision of a quiet space to complete such documentation
>   3) Maximum scheduling of no more than two patients consecutively
>   4) Additional time to complete documentation after each one or two patients

(Doc. 11 at 51.)

Once Plaintiff began her employment, Ultimate allegedly did not ensure that Plaintiff's accommodations were implemented. Plaintiff alleges that Ultimate required her to accelerate the pace of her patient documentation, refused to allow her to arrive early or stay late to finish such documentation, failed to provide Plaintiff with a quiet space to complete the documentation, scheduled Plaintiff to meet with three patients consecutively, and demanded that Plaintiff carry a laptop computer and document patient information. (*Id.* at 51-52.)

On January 30, 2017, Ultimate allegedly demanded that Plaintiff meet with four patients consecutively and finish the requisite documentation by a time demanded by Ultimate. (*Id.*) Plaintiff was able to complete both assignments but allegedly committed two safety violations in doing so. (*Id.* at 52.) No patients were injured as a result of Plaintiff's actions. (*Id.*)

The next day, Ultimate informed Plaintiff that she would not be allowed to meet with patients. (*Id.*) On February 1, 2017, Ultimate contacted Meredith regarding Plaintiff's performance and Meredith subsequently informed Plaintiff that she was being dismissed due to her alleged failure to follow safety protocols. (*Id.*) Plaintiff's dismissal triggered a failure of her second Level II field placement work and caused her to be dismissed from the program. (*Id.*)

### III. LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), a claim survives a motion to dismiss if the claim "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atl. v. Twombly*, 550 U.S. 544, 555-56 (2007) (internal citations omitted).

A complaint is deficient "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 697. The Court also construes "the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). However, Plaintiff must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## IV. ANALYSIS

### A. Plaintiff's ADA/OCRA Public Accommodation Claim[5]

Plaintiff's Title III ADA claim raises a question regarding the scope of the class protected by this statute and whether an unpaid field placement student qualifies as a customer or client under its provisions.[6]

The general rule of Title III states:

> *No individual shall be discriminated against* on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

---

[5] This memorandum opinion omits a separate analysis under Ohio Rev. Code. Ann. 4112.02(G) as a review of the federal claim will resolve its Ohio counterpart. *See Pinchot v. Mahoning Cty. Sheriff's Dep't*, 164 Ohio.App.3d 718, 722 (2005) (Courts can generally look "to the ADA and its interpretation by federal courts for guidance in interpreting the Ohio statute."); *Scalia v. Aldi, Inc.*, 2011 WL 6740756 (Ohio App. 9 Dist) (observing that federal decisions on the ADA are relevant to cases under the Ohio statute "when the terms of the federal statute are consistent with Ohio law or when R.C. Chapter 4112 leaves a term undefined.")

[6] The parties do not dispute that Plaintiff was disabled or that Ultimate is a place of public accommodation, although the briefs do not specify under what category Ultimate falls. Presumably, Ultimate falls under 42 U.S.C. § 12181(7)(F) as a "professional office of a health care provider, hospital, or other service establishment."

42 U.S.C. 12182(a) (emphasis added). However, a sub-provision may limit the statute's construction only to "clients or customers." It relates: "for purposes of clauses (i) through (iii) of this subparagraph, the term "individual or class of individuals" refers to the *clients or customers* of the covered public accommodation that enters into the contractual, licensing or other arrangement." 42 U.S.C. 12182(b)(1)(A)(iv) (emphasis added).

*PGA Tour Inc. v. Martin*, 532 U.S. 661, 679 (2001), attempted to clarify Title III's scope stating that "clause (iv) is not literally applicable to Title III's general rule that prohibiting discrimination against disabled individuals. Title III's broad general rule contains no express 'clients or customers' limitation . . . ." Despite holding that Title III possesses no literal restriction, the Court declined to discuss the validity of the petitioner's claim that only clients and customers are protected under this provision because the Court determined that the petitioner could be considered a client or customer anyway. *Id.* at 679.

At least three appellate courts have applied the same interpretation regarding the interplay between 42 U.S.C. 12182(a) and 12182(b)(1)(A)(iv). Recently, the Eleventh Circuit reiterated that Congress intended the "client and customer" limitation only to apply to three prohibited activities and did not impact the scope of the ADA's general rule. *Hous. v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1333 (11th Cir. 2013). According to its rationale, "[t]hese examples illustrate that Congress has said so expressly when it wants to limit the class of people protected by anti-discrimination statutes to only clients or customers or to people of bona fide status." *Id.* at 1334. Likewise, *Molski v. M.J. Cable, Inc.*, held that § 12182(b)(1)(A)(iv)'s "client or customer" limitation does not apply to § 12182(a). 481 F.3d 724, 733 (9th Cir. 2007). Last, *Menkowitz v. Pottstown Mem'l Med. Ctr.*, held that "both the language of Title III and its legislative history clearly demonstrate [that] the phrase 'clients or customers' only appears in 42 U.S.C. §

6

12182(b)(1)(A)(iv), is not a general circumscription of Title III and cannot serve to limit the broad rule announced in 42 U.S.C. § 12182(a)," and noted that the "[t]he operative rule announced in Title III speaks not in terms of 'guests,' 'patrons,' 'clients,' 'customers,' or 'members of the public' but, instead, broadly uses the word 'individuals.'" 154 F.3d 113, 121-22 (3d Cir. 1998).

Although the Sixth Circuit has not spoken directly on this issue, lower courts both within and outside the Circuit have applied the above interpretation. In *Badri v. Huron Hosp.*, No.: 1:08cv01913, 2009 WL 10689494, at *3 (N.D. Ohio Aug. 14, 2009), the district court determined that a disabled physician who had his clinical privileges revoked by his affiliated hospital could make a claim under Title III as an individual even if he was not a customer or client of the hospital. *See also Robinson v. Carealliance Health Servs.*, No. 2:13-cv-01916-RMG, 2014 WL 4402684, at *4 (D.S.C. Sept. 4, 2014) ("As the Supreme Court explained, in keeping with *Menkowitz*, Title III's broad general rule banning discrimination contains no 'clients or customers' wording that would limit access to Title III coverage to that class."); *Haas v. Wyo. Valley Health Care Sys.*, 553 F. Supp. 2d 390, 396 (M.D. Pa. 2008) (citing *Menkowitz*); *Hetz v. Aurora Med. Ctr. of Manitowoc Cnty.*, No. 06-C-636, 2007 WL 1753428, at *11 (E.D. Wis. June 18, 2007) ("The use of the general term 'individual' rather than 'client or customer' accurately reflects the expansive purpose of the ADA.").

The Court applies this interpretation which allows Plaintiff to maintain her Title III claim on the basis that she is an individual who was denied an opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to those afforded to other individuals. 42 U.S.C. § 12182(a). Plaintiff's Amended Complaint has pleaded sufficient facts to survive a Rule 12(b)(6) motion to dismiss. She alleges that she possesses several learning disabilities that were documented and addressed by Findlay in the form of an

accommodation plan that was transmitted to Ultimate for implementation. (Doc. 11 at 47.) Plaintiff further alleges that Ultimate failed to implement her accommodation plan causing Plaintiff to be unable to complete her work and contributing to Plaintiff allegedly engaging in multiple safety violations. (Doc. 11 at 50-52.) These facts' specificity surpass mere speculation and are not threadbare in any capacity. Plaintiff thus has demonstrated that she may be able to satisfy the elements of a prima facie Title III ADA claim as an individual and should be allowed to proceed as such. *See Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1166 (E.D. Mich. 1994) (stating that to set forth a prima facie case, a plaintiff must prove that "she has a disability, that defendant's office is a place of public accommodation, and that she was denied full and equal . . . treatment because of her disability").

### B. Plaintiff's OCRA Employment Claim[7]

The central question regarding Plaintiff's OCRA employment claim is whether Plaintiff's status as an unpaid field placement student would qualify as an employee under this Ohio statute. Ohio Rev. Code. Ann. § 4112.02(A). If Plaintiff cannot be considered an employee, she cannot maintain a viable claim for which this Court could grant relief.

It follows that the scope of the employer-employee relationship forms the heart of the parties' dispute on this claim. Since ADA claims are analyzed similarly to their Title VII counterparts, the Court looks for guidance under the latter statute. Generally, the Sixth Circuit has broadly construed the term "employee" in the Title VII context. *Armbuster v. Quinn*, 711 F.2d 1332, 1340 (6th Cir. 1983). To determine if an individual is an "employee", federal courts look to

---

[7] As with a public accommodation claim, federal courts interpret the Ohio Civil Rights Act consistent with the ADA. *See House v. Kirtland Capital Partners*, 158 Ohio App. 3d 68, 70 (C.A.11 2004) (standards for assessing an employment claim under the ADA and § 4112.02(A) are virtually identical).

the economic component of the relationship between the individual and employers. *Ivan v. Kent State Univ.*, 863 F. Supp. 581, 585 (N.D. Ohio 1994). Looking at the relationship's economic component is instructive because economic dependence increases an employees' susceptibility to discriminatory practices. *Kirby v. Robby Len Swimfashions*, No. 89-6038, 1990 WL 72322, at *1-2 (6th Cir. June 1, 1990). Accordingly, the "economic-realities" test allows for a case-by-case determination of employment status based on an examination of the totality of the employment. *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir.).

In this matter, the Amended Complaint does not raise sufficient facts for the Court to determine that Plaintiff could be considered an "employee" under the above construct. At the outset, the terminology used to characterize Plaintiff's work with Ultimate is instructive. First, Plaintiff never avers that she was Ultimate's employee or otherwise uses that term about Ultimate in the Amended Complaint. (Doc. 11 at 50-52.) Next, Plaintiff describes her experience as a field placement which is insufficient for the Court to infer reasonably that Plaintiff received compensation for her services. Plaintiff makes no allegation that she received monetary compensation in any form for applying and developing her occupational rehabilitation skills while associated with Ultimate. (*Id.*) Last, Plaintiff has not pleaded any facts that address whether Plaintiff signed any separate agreement to render services for Ultimate that would shed additional light on the relationship. Viewed in its totality and in Plaintiff's favor, there are not sufficient facts to suggest that Plaintiff could properly be considered an employee under
Ohio Rev. Code. Ann. § 4112.02(A).

The above situation differs considerably from instances where federal courts have found that a graduate student was able to demonstrate that they were an employee entitled to relief under either Title VII or the ADA. In *Ivan*, the district court found that a graduate student had adduced

sufficient evidence during discovery to prove that she was an employee warranting Title VII protection. 863 F. Supp. at 585-86. That evidence was three separate contracts with her university outlining the scope of her employment and modest monetary compensation in the form of a monthly graduate assistantship stipend. *Id.* at 585. There is no such evidence here that would indicate that Plaintiff's graduate student status constituted employment by Ultimate.

Rather, Plaintiff's employment claim relies on a more indirect theory. Plaintiff maintains that an employment relationship arose between herself and Ultimate because Ultimate possessed the ability to impact her employment opportunities elsewhere. (Doc. 12 at 67-68.) Plaintiff relies on several appellate and district court cases to support the proposition that Ultimate was in the position to impact her employment prospects. (*Id.*) Specifically, Plaintiff points to *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870 (6th Cir. 1991), in which an Ohio nurse filed a Title VII action against her hospital challenging the refusal to grant the nurse limited privileges that would have allowed her to work as a private scrub nurse for the hospital's doctors. The panel applied a broad interpretation of the employment relationship, holding that the hospital's denial of privileges directly impacted the nurse's employment opportunities even though she was not directly employed by the hospital. (*Id.* at 876-77).

Plaintiff also relies on *LeMasters v. Christ Hosp.*, 777 F. Supp. 1378 (S.D. Ohio 1991), and *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291 (11th Cir. 1998), as cases where medical staff or rotation privileges were revoked by hospitals that did not directly employ these medical personnel. In both instances, the courts held that these personnel could be considered employees for Title VII statutory purposes because the hospitals occupied a position to interfere with employment opportunities despite not employing either individual. Such holdings, in Plaintiff's view, point to an expansive view of the employer-employee relationship that is extant in the present case.

This argument misses the mark, however, as the employment relationship at issue in those cases was far more developed than Plaintiff acknowledges. For example, in *Christopher*, plaintiff, although not a formal hospital employee, was paid and insured by it during her training period and during the tenure of her temporary privileges status. 936 F.3d at 872. Likewise, in *Zaklama,* the plaintiff was a resident anesthesiologist who was considered an appointee by the hospital and required to abide by the institution's rules and regulations. 842 F.2d at 293. Last, in *LeMasters* the plaintiff was a board-certified physician in obstetrics and gynecology formally employed by a third-party but who received clinical staff privileges from the defendant hospital who later revoked them. 777 F. Supp. at 1378.

Two observations arise from these cases that demonstrate why they are inapplicable here. First, although they were not formally employed by these institutions, the plaintiffs in these cases had established more formalized relationships with the hospitals such as monetary compensation and contractual or regulatory obligations. Second, the hospitals all possessed direct control over these plaintiffs' employment opportunities, despite not formally hiring them.

In the current matter, Ultimate's control of Plaintiff's employment opportunities was far more attenuated. Ultimate made a discrete decision that Plaintiff could no longer render her services at its facility due to her safety violations, but it was ultimately Findlay's determination that Plaintiff's progress was insufficient to remain in its program. This distinguishes Ultimate from the hospitals in the cases on which Plaintiffs relies. The informal relationship between Plaintiff and Ultimate and Ultimate's attenuated impact over Plaintiff's employment opportunities is insufficient to support this claim.

## V. CONCLUSION

Therefore, having reviewed this matter, and the Court being sufficiently advised,

**IT IS ORDERED** that Defendant Ultimate's motion to dismiss (Doc. 15) is hereby **DENIED** concerning Plaintiff's ADA and OCRA public accommodation claim and is **GRANTED** regarding Plaintiff's OCRA employment claim.

This 31st day of August 2018.



Signed By:
William O. Bertelsman
United States District Judge