CIVIL ACTION NO.: 1:17-cv-00713 (WOB-SKB)

NICOLE CHRIST                                          PLAINTIFF


V.                          MEMORANDUM OPINION AND ORDER


UNIVERSITY OF FINDLAY, ET AL.                    DEFENDANTS


Plaintiff Nicole Christ alleges that defendants University of Findlay and Ultimate Rehab, LLC, discriminated against her on the basis of her disabilities in violation of the ADA, the Rehabilitation Act, and the Ohio Civil Rights Act. Both defendants have moved for summary judgment. (Docs. 29, 34). The Court has reviewed the submitted materials and finds that oral argument is not necessary. S.D. Ohio Civ. R. 7.1(a). The Court now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

#### A. **Christ's diagnoses and academic background.**

Plaintiff Nicole Christ was diagnosed with anxiety in 1999 and with ADHD in 2008.[1] (Christ Dep., Doc. 38 vol. 1 at 47, 63). When Christ enrolled in University of Findlay's ("Findlay") undergraduate program in 2013, she sought accommodations to help alleviate these disabilities' effects. Findlay allowed her to have extra time for lab test sections with few other people in the room. (*Id.* at 105; *see also* Doc. 38-1).

---

[1] Christ also believes she has an auditory processing disorder, but it has never officially been diagnosed. (Christ Dep., Doc. 38 vol. 1 at 67-68). She does, however, wear a hearing aid. (*Id.* at 10).

After successfully completing her undergraduate work at Findlay, Christ enrolled in its Masters of Occupational Therapy ("MOT") program. (Christ Dep., Doc. 38 vol. 1 at 176). Occupational therapy strives to improve the quality of a patient's life and their life skills. (*Id.* at 75; Coalt Dep., Doc. 36 at 7-8). It is provided in a variety of settings, including hospitals, inpatient rehabilitation centers, and mental health settings. (Christ Dep., Doc. 38 vol. 1 at 76; Coalt Dep., Doc. 36 at 8).

### B. Findlay's Masters in Occupational Therapy Program Requirements.

The MOT program is comprised of two components: a didactic portion, where the students take classes, and a fieldwork portion. (Dillon Dep., Doc. 37 at 19-20). The purpose of fieldwork is to prepare students to become generalists, pursuant to the accreditation standards that Findlay is required to follow.[2] (*Id.* at 15). There are two kinds of fieldwork experiences that students must complete. The first is referred to as "Level 1" placements. These are one week long and primarily give students opportunities to observe practicing therapists along with some hands-on experience. (Coalt Dep., Doc. 36 at 34). A student must successfully complete three Level 1 experiences. (Christ Dep., Doc. 38 vol. 1 at 135).

"Level 2" field experiences are more intense. These are twelve weeks long and are meant to prepare the students to be entry-level generalists at the end of the placements. (*Id.* at 135; Dillon Dep., 37 at 15). Students are expected to gradually assume their supervisor's responsibilities and duties over the course of the placement. (Christ Dep., Doc. 38 vol. 1 at 135). Per the MOT Program Student Fieldwork Manual, a student is not allowed to discontinue or fail more than two fieldwork experiences. (Doc. 34-2 at UF/Christ-875). Students are evaluated by their "Fieldwork Educators"

---

[2] Findlay's MOT program is accredited by the Accreditation Council for Occupational Therapy Education ("ACOTE"). (Dillon Dep., Doc. 37 at 13).

("FEs") twice during their placement. (*Id.* at UF/Christ-000907). These evaluations consider several facets of occupational-therapist work, including evaluation and screening abilities, communication skills, and professional behaviors. (*Id.* at UF/Christ-000909-11). This rubric also looks at a student's ability to practice safely and ethically. (*Id.* at UF/Christ-000908). The student is generally graded on a scale of one to four, with four being "exceeds standards." (*Id.* at UF/Christ-000907). For a student's "Ethics and Safety Items," though, a student must score at least a three for each item on her final fieldwork evaluation. (*Id.*)

### C. Christ's Participation in the MOT Program.

When Christ began the MOT program, she received accommodations for the didactic portion—extra time for written tests—and testified that this was effective in helping her learn. (Christ Dep., Doc. 38 vol. 1 at 177, 179). When Christ began the fieldwork portion, she did not request any accommodations for her Level 1 experiences and successfully completed the required placements. (*Id.* at 142, 156-57, 168, 176).

Christ believed that accommodations would be necessary for her Level 2 placements, however, primarily because of the increased documentation she would be required to do.[3] (*Id.* at 138-39). Christ's advisor in the MOT program was Heather Meredith ("Meredith").[4] (Coalt Dep., Doc. 36 at 9). The two women worked together to create a list of accommodations for Christ's Level 2 placements. (*Id.* at 27). They designed several accommodations, but the accommodation

---

[3] Christ also believed accommodations would help her more easily adapt to the various computer systems she would use at the different fieldwork placement sites, as well as using diagnostic codes. (*Id.* at 138-39).

[4] Meredith has since changed her last name to Coalt. (Coalt Dep., Doc. 36 at 4). Any reference in the record to Coalt is thus a reference to Meredith. Meredith is also the Instructor/Academic Fieldwork Coordinator for Findlay. (*Id.* at 6).

most relevant here was Christ's request for "[e]xtra time:" she requested an "[a]s needed ability to come in early or stay late to complete paperwork or prepare for the following day." (Doc. 38-9 at NC000032).[5] Christ believed that these accommodations were appropriate. (Christ Dep., Doc. 38 vol. 2 at 9). Meredith shared these accommodations with each of Christ's Level 2 placements. (Coalt Dep., Doc. 36 at 36, 51). While fieldwork sites are allowed to say that they cannot provide the requested accommodations, none of Christ's sites expressed such concerns. (*Id.* at 39). Once a site agrees, Meredith largely depends on students to tell her if a site fails to provide a requested accommodation. (*Id.* at 44-45).

Christ's requested accommodations were in place for her first Level 2 experience, which she passed.[6] (Christ Dep., Doc. 38 vol. 1 at 188, 211). Christ's next placement was with a hand-

---

[5] Her other requested accommodations were:
1. Complete day of observation, introduction and familiarizing self with facility prior to official start date.
2. Complete documentation in a room with limited distractions.
3. Wear earphones or noise cancelling headphones during documentation
4. Clearly outline expectations
5. Extra time
a. As needed ability to come in early or stay late to complete paperwork or prepare for the following day
b. Ability to take assessments/manuals or protocols home for review, to prepare for use with clients
6. Scheduling of patients:
a. When possible to set daily schedule of 1-2 patients and then time to complete documentation, 1-2 patients and time to complete documentation for the daily caseload.
7. To design a template for self-organization of all documentation and responsibilities for daily use (notes, billing, etc.).
8. External Reminders/cues: a. Verbal cue of "hold that thought" b. Visual cue to also cue student to refocus.
(Doc. 38-9 at 13).

[6] While Christ passed her first Level 2 placement, Meredith was unaware of the specific requirements that were in place at the end of this placement. (Meredith Dep., Doc. 36 at 115). Christ was only responsible for 50% of her supervising occupational therapist's caseload and the percentage should have been higher. (*Id.*) Meredith therefore questioned whether Christ's

therapy provider that Christ had specifically requested, Hand Rehabilitation & Orthotic Specialists ("Hand Rehab"). (*Id.* at 214; Coalt Dep., Doc. 36 at 50, 52). Hand Rehab implemented the accommodations that Christ requested. (Christ Dep. Doc. 38 vol. 3 at 70-71).

However, Christ had difficulty due to the fast-paced environment, reporting to multiple supervisors and locations, and the specialized nature of the work. (Christ Dep. Doc. 38 vol. 1 at 214-16; vol. 2 at 9-11). In fact, Christ did not believe she could pass this field placement, and she called Meredith to tell her she was upset and overwhelmed. (Christ Depo. Doc. 38, vol. 2 at 9, 16-17; Coalt Depo. at 57-58).

Christ's FE at Hand Rehab also had informed Meredith that Christ was not progressing as she should have been and that Christ was overthinking things, which could lead to safety issues. (Coalt Dep. Doc. 36 at 56; Doc. 34-2 at UF/Christ000242). Christ's FE performed an evaluation for Christ's time at Hand Rehab and only scored her safety items at a two. (Doc. 38-11 at NC000391). Meredith thus recommended that they remove Christ from the Hand Rehab placement, and Christ agreed. (Christ Dep. Vol. 2 at 17; Coalt Dep. at 54-58).

### D. Christ's first failure at a Level 2 placement.

Meredith then placed Christ in another hand therapy site, Kettering Physical Medicine and Rehab ("Kettering"), because she believed that Christ was still interested in that area. (*Id.* at 58-59). Christ now denies that interest but admits that she did not offer any alternative suggestions and felt that she "was going to work with what [Meredith] had suggested."[7] (Christ Dep., Doc. 38 vol. 2 at 24).

---

passing grade was appropriate since her responsibilities were not as great as they should have been. (*Id.* at 115-16).

[7]There is a dispute as to the expectation for Christ's new placement, specifically concerning how far along Christ should have been when she started at this different site. Both Christ and Meredith

Christ's accommodations were discussed with the FEs at Kettering, and Christ testified that they were supportive of those requests. (Coalt Dep., Doc. 36 at 63; Christ Dep., Doc. 38 vol. 2 at 26). However, Christ still struggled. Performing evaluations was a particular source of trouble, and her FEs proposed a plan to help Christ improve her skills by performing mock evaluations. (Christ Dep., Doc. 38 vol. 2 at 37). Yet Christ was not able to satisfactorily perform these mock evaluations. (*Id.* at 38). The Kettering Fes provided feedback to Christ that she was not completing a variety of tasks as expected. (Christ Dep., Doc. 38 vol. 2 at 31-38).

Christ testified that her anxiety impacted her ability to do evaluations. (*Id*. at 31, 40). She informed Meredith that she was having issues and, while Meredith testified she gave Christ some ideas on how to deal with her anxiety, Christ testified that Meredith simply told her not to discuss her anxiety with her FEs. (*Id.* at 40; Coalt Dep., Doc. 36 at 67-68). Because Christ was not improving as her FEs believed she should, they did not believe she would successfully complete the program and thus ended Christ's placement early. (Coalt Dep., Doc. 38 at 71). This was Christ's first Level 2 failure. (*Id.* at 76). While Christ believes not all of her accommodations were met there,[8] she explained that the "number one reason" for her failure was that the site was too advanced and too fast-paced for her. (Christ Dep., Doc. 38 vol. 2 at 39, 48).

---

agreed that Christ was not starting this next Level 2 placement as if it were brand new; Christ received some credit for the time she spent at Hand Rehab and this placement would not last the normal 12-week period. (Christ Dep., Doc. 38 vol. 2 at 22-23; Coalt Dep., Doc. 36 at 69-70). However, Christ believed that she should have received a "transition" period for orientation to the new system and clinic that would have lasted a few weeks. (Christ Dep., Doc. 38 vol. 2 at 22). Meredith and the FEs at her new site did not see it this way—they believed that, because this was a continuation of her second Level 2 fieldwork placement, she should be treated as though she were starting her fourth week despite that fourth week taking place in a new clinic. (Coalt Dep., Doc. 36 at 69-70). This difference of opinion, however, does not create a genuine dispute of material fact.

[8] Christ was not given a day of orientation; did not have a room with limited distractions at every clinic; possibly could not wear headphones because she needed to be available to answer the

When a student fails a fieldwork placement, they must complete a "learning contract" that addresses why they failed and which creates a plan, including remedial work, to help them improve. (*See* Coalt Dep., Doc. 36 at 76-78). The remedial work must be completed before a student receives her next placement. (*Id.* at 77-78). One condition clearly stated in the learning contract is that a "second failed or discontinued fieldwork experience will result in" no further placements and dismissal from the program. (Doc. 38-13 at NC000076; Christ Dep., Doc. 38 vol. 2 at 47). Christ took issue with this condition since she believed that her first failure was because the site was "too advanced for me," but she understood that the rule that two placement failures would lead to dismissal from the program applied to all students. (Christ Dep., Doc. 38 vol. 2 at 46-47).

Christ signed the learning contract and completed her remedial work. Prior to her final fieldwork placement, Christ asked Meredith about any mental health or home therapy options for her last placement. (Coalt Dep., Doc. 36 at 84). Meredith testified that she considered these areas but did not pursue them because home therapy is rare in the geographic location Christ requested and mental health placements are not as beneficial in training students to become generalists as are other areas of practice. (*Id.* at 84-85).

### E. Christ's placement at Ultimate Rehab.

Meredith decided to place Christ at Ultimate Rehab, Ltd. ("Ultimate Rehab") because she believed it was a stable environment that would be a good fit for Christ. (*Id.* at 82-83). Ultimate Rehab provides rehabilitation services at nursing homes. (Doc. 29 at 3). Megan Weber ("Weber") was Christ's FE and supervising occupational therapist. (Coalt Dep., Doc. 36 at 87). Christ was

---

phone; and designed templates but was told that they were "robotic." (Christ Dep., Doc. 38 at 50-53). She did not mention a lack of extra time to document.

Weber's first student. (Weber Dep., Doc. 32 at 30). Pursuant to her accommodations, Christ met with Weber for a day of orientation prior to starting the placement. (Christ Dep., Doc. 38 vol. 2 at 96-97). She also discussed her other accommodations with Weber and Weber did not believe they would be an issue. (*Id.* at 64-65; Weber Dep., Doc. 32 at 7-8).

Christ does not dispute that Ultimate Rehab provided many of her accommodations.[9] Her request for extra time, though, was an issue. It is undisputed that Christ was allowed to come to work early, but she was limited in what she could do during that time. Christ was not authorized to review case materials for patients that would be evaluated that day because she was not allowed to start an evaluation and because that extra time would be billed to clients. (Christ Dep., Doc. 38 vol. 2 at 72, 105; Weber Dep. Doc. 32 at 21-22).

Staying late was also a point of contention. Weber's normal workday ended at 4:00 P.M. (*Id.* at 25). Weber agreed to the accommodation of time "[a]s needed . . . to come in early or stay late" because she believed that Christ would only need to stay about thirty to forty-five minutes late, but Weber testified that it became one to two hours instead. (*Id.* at 26).[10]

Because this was intruding into Weber's personal time, she spoke to her supervisor, Jessica Rolfes ("Rolfes"). (Weber Dep., Doc. 32 at 25-26; Rolfes Dep., Doc. 33 at 6, 15). Christ testified

---

[9] Christ agrees that she was given a distraction-free room for her documentation; allowed to wear headphones; provided with clearly outlined expectations; and allowed to create templates. (Christ Dep., Doc. 38 vol. 2 at 73, 102-03, 109-10). While she testified that she was not always allowed to see four patients a day with a break between her second and third patients, she admits that she was allowed to take the required break at least sometimes. (*Id.* at 112). She does not remember Weber using the verbal and visual cues. (*Id.* at 114-15).

[10] While Christ asked to stay late as she needed to finish her documentation, she did have a weekly group therapy session that necessitated leaving around 4:30 P.M., and Christ admits that she was able to finish her documentation such that she never missed a group-therapy session. (Christ Dep., Doc. 38 vol. 2 at 98, 145).

that Rolfes thereafter told her to be done with her documentation by 4:00 or even 3:30 P.M. (Christ Dep., Doc. 38 vol. 2 at 107, 143). Rolfes testified that she asked Christ to finish by the end of Weber's workday at 4:00 but they modified Christ's schedule so she had more time during the day to document. (Rolfes Dep., Doc. 33 at 15-16). Christ disputes this, though, and testified that they did not change her schedule to allow for more documentation during the day. (Christ Dep., Doc. 38 vol. 2 at 107-08). Christ testified that she told Meredith she was not allowed to review certain documents in the morning, nor was she allowed to stay late in the evening. (*Id.* at 72-73). But Meredith also thought that Ultimate Rehab was trying to accommodate Christ's need for extra documentation time during the day. (Coalt Dep., Doc. 36 at 97).

Christ admits that she was told her documentation was too slow, but she believed that having more time in the evening to improve would help her become quicker. (Christ Dep., Doc. 38 vol.*2* at 79, 139). She wanted to stay until 6:00 P.M., which is when Ultimate Rehab's lab closed, and believed that she could stay without Weber needing to stay as well. (*Id.* at 140-42). However, she admits that she never asked for this accommodation. (*Id.* at 143).

In any event, Weber testified that there would have been two problems with that arrangement. The first was that Weber was protective of Christ since Christ was her first student. (Weber Dep., Doc. 32 at 27). The second, and more important issue, is that Ultimate Rehab has a corporate policy that requires paperwork to be done by the end of the day. (Schoenberger Dec., Doc. 29-1 ¶ 6). This is designed to maintain accurate, complete, and timely records. (*Id.* ¶ 7). Christ was aware of this policy and understood that it applied to her. (Christ Dep., Doc. 38 vol. 2 at 143-44). Because Weber was Christ's supervisor, Christ's documentation required Weber to sign off on it for it to be complete. (Weber Dep., Doc. 32 at 30). Therefore, allowing Christ to stay late without Weber would not comport with this policy.

**F. Christ commits several safety violations that result in her termination and dismissal.**

Christ was also spending much of her time working with patients. It was certain patient encounters that lead to Christ's release from Ultimate Rehab. Over the course of two weeks, Christ committed three separate safety violations.

The first violation occurred when Christ instructed a patient, who had recently undergone shoulder surgery and was not supposed to use one arm, to take off or put on a sock—a task that involved both arms and therefore violated his post-surgery restrictions. (Christ Dep. Doc. 38 vol. 2 at 115; Weber Dep., Doc. 32 at 37). Weber intervened before the patient carried out the instruction. (Weber Dep., Doc. 32 at 37). Christ admits that this created a risk for the patient and that none of her accommodations required a site to compromise its safety rules. (Christ Dep., Doc. 38 vol. 2 at 117).

Later that same week, Christ was working with a patient who, due to balance issues, needed the therapist to constantly be in close proximity to prevent a fall. When Christ realized she had left her computer open for others to see, Christ turned away from the patient—which was a safety violation. (*Id.* at 117-19, 134).

Weber reported these safety incidents to Stacy Schoenberger ("Schoenberger"). (*Id.* at 39-40). Schoenberger oversaw the student program at Ultimate Rehab and was involved in deciding if students should be removed from the placement. (Schoenberger Dep., Doc. 35 at 6-7). Weber testified that Schoenberger and Rolfes instructed her to tell Christ that an actual clinician could be terminated for these violations. (Weber Dep., Doc. 32 at 39-40). Christ does not remember this conversation, though. (Christ Dep., Doc. 38 vol. 2 at 135). While Schoenberger was not

considering terminating Christ at this time, she did email Meredith after these incidents and ask her to come for a site visit the following week. (Schoenberger Dep., Doc. 35 at 24; Doc. 36-18 at UF/Christ-000342).

On the day of the final safety incident, Rolfes told Christ she needed to finish her documentation by 1:00 P.M. because the computers were set to go down around that time. (Christ Dep., Doc. 38 vol. 2 at 130). While Christ was able to complete her documentation, she felt that this temporary deadline created anxiety for her. (*Id.* at 132). The same day, Christ was working with a patient in a wheelchair and Weber reminded her to ensure that the wheels were locked. (*Id.* at 123). Christ did not check both wheels before the patient sat down and one of the wheels was only partially locked and moved a little. (*Id.* at 123-24). Christ admits that both wheels should have been fully locked and that this constituted a safety violation. (*Id.* at 124).

After this third incident, Schoenberger, along with someone in the executive office, decided to terminate Christ's placement. (Schoenberger Dep., Doc. 35 at 43). Schoenberger and Weber informed Meredith at their previously scheduled meeting that Christ was terminated because of her safety violations. (Coalt Dep., Doc. 36 at 101-02).

Meredith thereafter met with Christ and told her that Ultimate Rehab had terminated her placement due to the safety violations. (Coalt Dep., Doc. 36 at 103-04; Christ Dep., Doc. 38 vol. 2 at 147). Christ "[a]bsolutely" understood that safety was the reason for her termination. (Christ Dep., Doc. 38 vol. 2 at 148). On February 2, 2017, Christ was officially terminated from the MOT program at Findlay because of her safety violations and her failures in two Level 2 Placements. (Doc. 38-17 at NC000022; Coalt Dep., Doc. 36 at 104).

Christ appealed this dismissal. (Christ Dep., Doc. 38 vol. 3 at 12-13). Findlay reviewed the decision, but Christ was not reinstated to the program. (*Id.* vol. 2 at 87-89).

### G. Procedural History

Christ brought suit against both Findlay and Ultimate Rehab on October 25, 2017. (Doc. 1). She alleges claims under Title III of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Ohio Civil Rights Act against Findlay for discriminating against her on the basis of her disability. (Doc. 11 ¶¶ 59-80). She also sued Ultimate Rehab under Title III and the Ohio Civil Rights Act.[11] (*Id.* ¶¶ 81-93). Both defendants have moved for summary judgment on all claims brought against them.

*Analysis*

### 1. Title III of the ADA, the Ohio Civil Rights Act, and the Rehabilitation Act.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must review the factual evidence in a light that is most favorable to the nonmoving party, drawing all reasonable inferences in her favor. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). "The defendant's motion for summary judgment should be granted 'when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to her case, and on which she will bear the burden of proof at trial.'" *Stallings v. Detroit Pub. Schs.*, 658 F. App'x 221, 224-25 (6th Cir. 2016) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999)) (internal quotations omitted).

Christ brought suit under Title III of the ADA, the Rehabilitation Act, and the Ohio Civil Rights Act. Title III of the ADA protects people with disabilities by prohibiting "discriminat[ion]

---

[11] Christ also brought an employment action under Ohio anti-disability discrimination law against Ultimate Rehab, too. (Doc. 11 ¶¶ 94-100). However, Ultimate Rehab successfully moved to dismiss this claim. (Doc. 21).

. . . on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Ohio also prohibits places of public accommodation and educational institutions from discriminating against people based on their disabilities. O.R.C. §§ 4112.02(G), 4112.022. Claims brought under the Ohio Civil Rights Act are generally analyzed by looking to the ADA and the Rehabilitation Act. *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). The Rehabilitation Act provides similar protection, with its main distinction being that it applies to entities that receive federal funding. 29 U.S.C. § 794(a); *see also McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir. 1997).

A more thorough discussion of the merits of Christ's claims follows below, but an initial point must be addressed. Title III allows for injunctive relief, but not monetary damages. *Neal v. Second Sole of Youngstown, Inc.*, No. 1:17-cv-1625, 2018 WL 1740140, at *6 (N.D. Ohio Apr. 11, 2018). Thus, "in order to have standing to sue under the ADA, a plaintiff must demonstrate a threat of future injury by showing an intent to return to the noncompliant accommodation or that he would return, but is deterred from visiting the noncompliant accommodation because of the alleged accessibility barriers." *Id.* (internal quotations omitted).

Because Christ has not pled any facts to establish that she is "likely to suffer discrimination in the future," *Gomez v. Dade Cnty. Fed. Credit Union*, 610 F. App'x 859, 863 (11th Cir. 2015), she does not have standing to sue under the ADA against either defendant. Christ seems to concede this by failing to address it in her response to Findlay's motion and by arguing that her state-law

claim allows for "much broader" relief than the ADA in her response to Ultimate Rehab.[12] (Doc. 42 at 17 n.8). However, since the statutes' analyses overlap to a large extent, the ADA's principles are discussed below despite Christ's lack of standing.

**2. Christ's claims against Findlay will be dismissed because she cannot establish an element of her prima facie case.**

Christ argues that there is a genuine question as to whether she was reasonably accommodated by Findlay, particularly since she believes Meredith failed to enforce Christ's requested accommodations. (*See, e.g.*, Doc. 41 at 18, 21). However, Christ's claims must be dismissed because she cannot establish that she was otherwise qualified to participate in Findlay's program.

"To establish that [s]he was dismissed from an academic program in violation of the ADA or Rehabilitation Act, a plaintiff must show that (1) [s]he is handicapped or disabled, (2) [s]he is 'otherwise qualified' to continue the program, and (3) [s]he was dismissed on the basis of [her] handicap or disability."[13] *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015); *see also Ohio Civ. Rights Comm'n v. Case W. Reserve Univ.*, 666 N.E.2d 1376, 1383 (Ohio 1996) ("In the past, we have looked to federal law to support a finding of discrimination under R.C. Chapter 4112."). To be otherwise qualified, a person with a disability must be able to meet the program's necessary requirements with reasonable accommodations. *Shaikh*, 608 F. App'x at 353; *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998).

---

[12] Christ is correct that her state-law claims allow for broader relief: "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." O.R.C. § 4112.99. Section 504 of the Rehabilitation Act also allows for compensatory damages. *See Johnson v. City of Saline*, 151 F.3d 564, 573 (6th Cir. 1998).

[13] For the purpose of this motion, Findlay does not dispute that Christ is disabled. (Doc. 34-1 at 12). Findlay also does not dispute that it receives federal financial assistance and is subject to claims under the Rehabilitation Act. (*Id.*).

The burden is on the plaintiff to prove that she is otherwise qualified. *Shaikh*, 608 F. App'x at 353. "A plaintiff thus bears the burden of proposing an accommodation and proving that it is reasonable, *including establishing that he can meet a program's necessary requirements with that accommodation*." *Id.* (emphasis added) (internal quotations omitted).

Further, because this is an academic program, the Court defers to the educational institution in its decisions concerning academic performance and its necessary requirements.[14] *Id.* "We should only reluctantly intervene in academic decisions especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession." *Kaltenberger*, 162 F.3d at 437 (internal quotations omitted). Additionally, "discrimination laws do not require an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Id.* at 436 (internal quotations omitted).

While Findlay points to a number of ways in which Christ was allegedly not qualified, the important issue is that of patient safety. Findlay argues that patient safety is "of primary importance" and that its requirements regarding patient safety are "essential." (Doc. 34-1 at 13). Students pass a fieldwork experience when their final score is based on receiving an average of three out of four points for most criteria. (*Id.* at 2-3). For the "Ethics and Safety Items," however, a student must receive *at least* a three on each item for the final evaluation. (Doc. 34-2 at UF/Christ-000907). Therefore, Findlay's evaluation process clearly prioritizes a student's ability to practice safely over other factors.

---

[14]Christ argues that Findlay does not deserve deference by relying on a non-binding case from another court in this district. (Doc. 41 at 25). Because Findlay made its decision after three undisputed safety violations and Christ herself agrees that safety is of "paramount importance" and should not be compromised even through accommodations, the Court declines to follow this other decision.

Christ does not dispute that patient safety is of utmost importance. It is clear that Christ struggled to focus appropriately when working with patients, which caused safety concerns at her placements and then three actual safety violations at Ultimate Rehab. (*See* Doc. 34-2 at UF/Christ-000242; Christ Dep., Doc. 38 vol. 2 at 115-18, 122-24). Consequently, because working safely with patients was a necessary requirement in Findlay's MOT Program that Christ struggled to satisfy, she needed to propose a reasonable accommodation that would enable her to meet this requirement. *See Jakubowski*, 627 F.3d at 202.

Unfortunately for Christ, she is unable to do so. Christ's requested accommodations, particularly her request for extra time in the mornings and evenings, are related not to safety, but to alleviating distractions while documenting or reviewing materials. Christ testified that she primarily wanted accommodations in order to better handle the increased documentation in her Level II fieldwork placements. (Christ Dep. Doc. 38 vol. 1 at 139) ("So when it came to the Level II, that was my biggest concern, was the fact that I definitely needed more time to be able to write."). Her requested accommodations were not designed to help her safely interact with patients. The disconnect between her accommodations and her inability to practice safely with patients is underscored by her testimony that distractions from other people and issues contributed to her safety violations. (Christ Dep., Doc. 38 vol. 2 at 116-19; 126-27).

Even at Hand Rehab—where Christ concedes she *was* accommodated—her FE had safety concerns because of Christ's inability to focus when working with patients and she received low safety scores. (*Id*. vol. 3 at 70-71; Doc. 38-11 at NC000391; Doc. 34-2 at UF/Christ-000242). Additionally, at Christ's second Level II placement, she did not testify that they refused to give her extra time to document and she still was unable to successfully complete patient evaluations. (Christ Dep., Doc. 38 vol. 2 at 37-38, 50-53). Christ primarily attributes her failure at this site to it

being too advanced for her—not a lack of any accommodation. (*Id.* at 48) ("[T]he placement was too advanced for me. And that is the number one reason."). Hence, while she now argues that she was not given many of her accommodations, her testimony reveals that her accommodations were not the cause of her first failure. Thus, it is clear that Christ's requested accommodations were not designed to help her meet the necessary requirement of working safely with patients.

The Sixth Circuit found that a plaintiff was not qualified in a similar situation in *Jakubowski*. The plaintiff was a medical resident who was required to communicate effectively with both his colleagues and his patients as part of the residency program—which he could not do without an accommodation. 627 F.3d at 201-02. His proposed accommodation enabled him to communicate with his colleagues but did not help him communicate with his patients. *Id.* at 202. Since his proposed accommodation only helped him meet one essential requirement as opposed to both, he was unable to satisfy the essential requirements of the program and was not qualified to continue. *Id.*

In her response, Christ fails to address the primary reason for her dismissal from the MOT program—patient safety. While she relies heavily on her belief that Meredith[15] did not ensure that Christ's accommodations were actually provided to her, she does not explain how these

---

[15]Christ makes much out of the fact that she asked Meredith about a placement in either a home therapy setting or a mental health setting. (Doc. 41 at 20). While she never explicitly characterizes this as a request for an accommodation, she seems to at least imply that it would have been an appropriate accommodation for her disabilities. (Doc. 41 at 20, 23). However, she did not request this as an accommodation. While a plaintiff does not have to use magic words in order to sufficiently request an accommodation, the context of the request needs to make clear that it is made "in order to conform with existing medical restrictions." *Hobbs v. Mahoning Cnty. Gen. Health Dist.*, No. 4:16CV2582, 2018 WL 1035140, at *6 (N.D. Ohio Feb. 22, 2018). Christ's email to Heather was not a request for an accommodation. She merely asked if there was a rotation in home therapy and said she was "wondering about a mental health rotation." (Coalt Dep., Doc. 36 Exh. 36-16). This general inquiry is not connected to Christ's disabilities or restrictions in any way and, to the extent that Christ argues this was a request for an accommodation, this argument fails.

accommodations would have helped her practice safely had they been implemented as she requested. Christ cannot simply say that, because she successfully passed her first Level 2 fieldwork placement where she was accommodated, it is clear that her accommodations made her qualified. (Doc. 41 at 19). Christ bears the burden of establishing that her requested accommodations enabled her to safely interact with patients; an *ipso facto* argument that rests solely on one successful Level 2 placement is not enough.

"Because the accommodations—that [the plaintiff] had the burden to propose—do not address a key obstacle preventing [her] from performing a necessary function . . ., [she] has not met [her] burden under the [ADA] of proving [she] is an otherwise qualified individual for the position." *Jakubowski*, 627 F.3d at 202. Since an element of Christ's prima facie case—being otherwise qualified—is lacking, her claims against Findlay will be dismissed.

### 3. Because Christ is not qualified, her claims against Ultimate Rehab are also dismissed.

Christ's claims against Ultimate Rehab[16] fail for a similar reason—she has not created a genuine question as to whether she was qualified to perform the necessary requirements. Christ's claims against Ultimate Rehab boil down to a failure-to-accommodate theory and, seemingly, disparate treatment since she argues against her termination by pointing to an allegedly similarly situated employee who received different treatment.[17]   (Doc. 42 at 23-25). "Under the ADA a

---

[16] Ultimate Rehab does not dispute that Christ is disabled for purposes of this motion. (Doc. 29 at 12 n.13).

[17] Christ's attempt to compare herself to this unnamed employee suffers from serious flaws. First, there is not enough detail in her response to establish that the two are similarly situated in relevant aspects. *See Badri v. Huron Hosp.*, 691 F. Supp. 2d 744, 760 (N.D. Ohio 2010). Further, it is hard to see how Christ was treated any worse than this employee since both were fired after their third safety violation. While Christ emphasizes that this other employee was not "immediately fired," there is no factual support to establish that Christ's termination was any more immediate than this unnamed employee's—they were both fired after their third violation. (Doc. 42 at 24). Therefore, her disparate-treatment theory fails.

plaintiff may purs[u]e a claim for disparate treatment or for a failure to accommodate." *Badri v. Huron Hosp.*, 691 F. Supp. 2d 744, 756 (N.D. Ohio 2010); *see also* 42 U.S.C. § 12182(b)(2)(A)(ii).

"[A] plaintiff must show that (1) she is handicapped or disabled as defined in [the] statute, (2) she is 'otherwise qualified' to continue in the program, and (3) she was dismissed from the program on the basis of her handicap or disability."[18] *Kaltenberger*, 162 F.3d at 435. The "otherwise qualified" element is required even in failure-to-accommodate claims. *Stallings*, 658 F. App'x at 225. Therefore, the same elements for her claims against Findlay apply to her claim against Ultimate Rehab.

In its motion, Ultimate Rehab did not argue that Christ was not qualified; hence, Christ did not have to respond by establishing that she was qualified for her claims against Ultimate Rehab. The Court is allowed to grant summary judgment on grounds that are not raised by the party. Fed. R. Civ. P. 56(f)(2). However, the Court acknowledges that it should give notice and a reasonable time for the party to respond prior to doing so. *Id.*

Even though the Court did not provide formal notice to Ultimate Rehab and Christ that it was considering this element under these claims, issuing judgment on this element is otherwise appropriate. While the Court believes Christ was sufficiently on notice that it would consider this

---

[18] The Court notes that *Kaltenberger* requires plaintiffs to be otherwise qualified under Title III even though Title III itself does not explicitly state that a plaintiff must be qualified. *See* 42 U.S.C. § 12182(a). This has been a necessary element for Title III claims in contexts other than academic programs. *See Dunning v. War Mem'l Hosp.*, 534 F. App'x 326, 332-33 (6th Cir. 2013). Other circuits have recognized that this is an essential element in the Sixth Circuit. *Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1105 (D.C. Cir. 2007). Requiring a plaintiff to prove that she is qualified makes sense, especially when "the public accommodation at issue is available to only qualified members of the general public." *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1289 (S.D. Fla. 2016). Christ was afforded an opportunity that made her much more like Ultimate Rehab's employees than other members of the public. Therefore, it is appropriate to first determine if she was qualified to have that opportunity.

element when deciding these motions,[19] the Court's judgment on this ground "will be upheld unless the losing party can demonstrate prejudice." *Smith*, 708 F.3d at 829. For prejudice, the party would have to "demonstrate that [she] could have produced new favorable evidence or arguments had more notice been given." *Id*. at 831 (internal quotations and alterations omitted). Under this factor, the Court notes the voluminous record before it and decides that it is unlikely that Christ could have adduced more evidence had she been given explicit notice that this element was being considered in her claims against Ultimate Rehab. *See Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 961 (6th Cir. 2007). Further, the fact that Christ bore this same burden for the same accommodations in response to Findlay's motion means that Christ's favorable arguments or evidence should already be before the Court. Consequently, it is hard to see how she is prejudiced in this instance.

Thus, Christ needed to prove that she was qualified under her claims against Ultimate Rehab in the same way that she needed to prove she was qualified for her claims against Findlay. The same accommodations are involved and Ultimate Rehab can point to three safety violations that undisputedly lead to her termination as proof that Christ could not perform its necessary requirements without accommodation. The most that Christ can say is that, if her accommodations

---

[19] For notice, "[t]he key inquiry is whether the losing party was on notice that he had to muster the necessary facts to withstand summary judgment, lest he face the dismissal of his claims." *Smith*, 708 F.3d at 829 (internal quotation omitted). Determining if a party was on notice is based on the totality of the proceedings before the Court. *Id.* While Ultimate Rehab did not explicitly argue that patient safety was a necessary requirement of its program, it is a clinic that provides rehabilitative services at nursing homes and it is inconceivable that a site like this would not highly prioritize patient safety. (Doc. 29 at 3). Ultimate Rehab also explained that it terminated Christ's placement because of safety incidents. (*Id.* at 16). Therefore, Ultimate Rehab would seemingly agree that Christ was required to practice safely in order to be qualified. Christ is familiar with this argument since she had to confront it head-on in response to Findlay's motion. The Court may consider co-defendant's motions when determining if a party was on notice that a particular ground would be considered. *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 407 (6th Cir. 1999).

had been implemented as she requested them, then maybe safety violations would not have occurred. (*See* Doc. 42 at 25).

"But it is well-established in our case law that a party may not avoid summary judgment by resorting to speculation, conjecture, or fantasy." *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (internal quotation omitted). This assertion amounts to speculation that becomes even more unlikely when Christ's testimony regarding her three safety incidents at Ultimate Rehab is considered. For each violation, Christ testified that she was distracted by other people's presence or concerns, such as leaving her computer open. (Christ Dep., Doc. 38 vol. 2 at 116-18; 127, 129-30). Christ did explain that, on the day of the third violation, Rolfes had told her she needed to finish her documentation by 1:00 P.M—which she was able to do—and this supposedly caused her to lose focus when working with this patient. (*Id.* at 131-32). But this is the only incident that is in any way related to her need for extra time to document and, again, she explained that there were other factors that distracted her.[20] Thus, even for the one incident that is somewhat connected to her documentation accommodation, it is not clear that having extra time in the evening would have helped Christ avoid this incident since it would not have removed the other distractions.

"[T]he plaintiff has the burden of proving that he will be capable of performing the essential functions of the job with the proposed accommodations." *Jakubowski*, 627 F.3d at 202. To assert that something might be true with no explanation or supporting facts does not satisfy this

---

[20] In her testimony, Christ said that she was focused on the patient but also that "there was a lot of things going on." (Christ Dep., Doc. 38 vol. 2 at 127; *see also id.* at 130). She explained that Weber was supposed to be in close proximity when working with this patient, but she was not and Christ had to find Weber when walking with this patient. (*Id.* at 128-29). Christ also repeatedly mentions that, unbeknownst to Christ, Schoenberger was in the room when Christ was not expecting her to be; she admits that she would not be distracted if she did not know Schoenberger was there, but mentions her presence more than once all the same. (*Id.* at 125, 129, 133).

burden. While the record is clear in establishing Christ's interest in and dedication to pursuing occupational therapy, it is also clear that she was not qualified at these times to serve at Ultimate Rehab. For this reason, her claims against Ultimate Rehab will be dismissed.

*Conclusion*

Therefore, having reviewed the matter, and the Court being otherwise advised, **IT IS ORDERED** that:

(1) The defendants' motions for summary judgment (Docs. 29, 34) be, and are hereby, **GRANTED**; and

(2) A separate judgment shall enter concurrently herewith

This 11th day of February 2020.



Signed By:

*William O. Bertelsman*

United States District Judge